IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Detention of:

P.E.

No. 87550-7-I

DIVISION ONE

UNPUBLISHED OPINION

DÍAZ, J. — P.E. challenges a superior court order committing him to 14 days of involuntary treatment pursuant to the involuntary treatment act (ITA), chapter 71.05 RCW. He claims that the court erred when it found that a less restrictive alternative was not in his or others' best interest. We affirm.

## I.    BACKGROUND

On December 3, 2024, P.E. arrived at Virginia Mason Medical Center seeking treatment for arm pain, but he would "not disclose what happened." He was disoriented and delusional at the hospital, screaming and yelling at hospital staff. He spoke about sabotage, radiation, and being punished by mercenaries from Norway. The hospital social worker could not get him to answer simple questions or meaningfully participate in the psychiatric assessment. At this time, P.E. was living at the Downtown Emergency Services Center (DESC) and

receiving services from a care team there. However, he could not or would not tell hospital staff where he lived.

Hospital staff referred P.E. to a King County designated crisis responder, who met with and evaluated P.E., later filing a petition for 120-hour initial detention under RCW 71.05.153. Fairfax Hospital, to which he had been admitted, then petitioned for a 14-day involuntary commitment.

On December 10, 2024, the court held a hearing. At the hearing, a doctor from Fairfax testified that P.E.'s "working diagnosis is unspecified schizophrenia spectrum and related disorders." Evidence of the disorder was primarily disorganized thought. P.E. was "speaking in word salad a lot of the time." But he also showed signs of delusions, such as accusing hospital staff of stealing money and indicating that "he had a team of medical professionals from the UK who he needed to wait on."

The court found that P.E. was gravely disabled. And the court found that a less restrictive alternative treatment was not in P.E.'s best interest because he "is not mentally stable, he does not understand he has a mental impairment, and is still symptomatic in the inpatient setting." The court ordered a 14-day involuntary commitment. P.E. timely appeals.

## II.     ANALYSIS

P.E. claims that the court erred when it concluded, under RCW 71.05.240, that a less restrictive alternative was not in his best interest. We hold that substantial evidence supports that finding.

Pursuant to RCW 71.05.240, a court must hold a probable cause hearing

2

on a petition requesting an order for up to 14 days of involuntary treatment and it may only enter such an order if, at the conclusion of the hearing:

> the court finds by a preponderance of the evidence that a person detained for behavioral health treatment, as the result of a behavioral health disorder, presents a likelihood of serious harm, or is gravely disabled, and, *after considering less restrictive alternatives to involuntary detention and treatment, finds that no such alternatives are in the best interests of such person or others*.

RCW 71.05.240(4)(a) (emphasis added). The State has the burden of proving that a less restrictive alternative is not in the best interests of person being committed. *In re Det. of T.A.H.-L.*, 123 Wn. App. 172, 186, 97 P.3d 767 (2004).

The ITA further provides two independently sufficient definitions of "gravely disabled"; namely:

> a condition in which a person, as a result of a behavioral health disorder:
>
> (a) [i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs for health or safety; or
> (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

RCW 71.05.020(25).

The court found that P.E. was gravely disabled under RCW 71.05.020(25)(a), a.k.a., "prong A." It specifically found that he "suffers from a behavioral health disorder with a working diagnosis of unspecified schizophrenia spectrum related disorder which has had a substantial adverse effect upon [his] cognitive and volitional functioning," and that therefore he was "in danger of serious physical harm, resulting from a failure or inability to provide for his/her essential

3

human needs of health and safety." P.E. effectively concedes that "his behavioral health disorder negatively affects his ability to meet his needs, as shown by lab results suggesting he was not eating properly." He does not assign error to the overall finding of grave disability, taking exception only to the finding that "a less restrictive treatment is not appropriate."

This court reviews whether substantial evidence supports the trial court's findings of fact, and whether the findings then support the conclusions of law. *In re LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). "We do not review a trial court's decision regarding witness credibility or the persuasiveness of the evidence." *In re Det. of A.F.*, 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021) (citing *In re Det. Of H.N.,* 188 Wn. App. 744, 763, 355 P.3d 294 (2015)). We hold that there was substantial evidence to support the finding that P.E. would not comply with a less restrictive treatment and the conclusion that a less restrictive treatment was not in his best interest.

Medical testing showed that P.E. had ketones in his urine, indicating he was suffering from malnourishment, and that he was underweight for his age. Doctors at Fairfax hospital diagnosed him with hyponatremia, i.e., abnormally low sodium levels. All this evidence together indicated that, even with support from DESC, P.E. had not been eating enough to meet his needs, and a treating physician, Dr. Robert Beatty, testified, that if these conditions continued, they would eventually result in death.

Although P.E. was eating when directed at Fairfax hospital, he continued to experience delusions, and Dr. Beatty testified that he did not think P.E. would

continue to eat on his own if he returned to DESC housing and services. Furthermore, when first treated at Virginia Mason Medical Center, P.E. told staff that he would refuse to return to his DESC residence, yelling, "I'm not going back there." The evidence above supports the court's conclusion that P.E. would not comply with a less restrictive treatment option and so such an option would not help him meet his basic needs and would not be in his best interest.

In response, P.E. claims that the court failed to consider the community resources that would offer support to him in less restrictive treatment. As part of the DESC housing program, P.E. has a care team that includes a health case manager, a housing case manager, and an onsite nurse.

But even though P.E. had access to said resources when he first arrived at Virginia Mason Medical Center, the evidence showed that he had been malnourished for some time. Thus, it was not an abuse of discretion for the court to find that these resources were not sufficiently providing for his essential human needs even with such support.

Furthermore, P.E. said that he would refuse to return to DESC housing. The court did not abuse its discretion in concluding that the services would be insufficient when evidence showed that P.E. did not want to avail himself of the services.

P.E. next claims that, because he had stabilized after being detained at Fairfax hospital, at the time of the hearing, less restrictive treatment was appropriate. It is true that, in an inpatient setting with constant care and supervision, P.E.'s condition stabilized somewhat. Treating doctors testified that

5

P.E. had been prescribed a balanced diet, was eating with no problem, and was also compliant regarding medication.

But per *LaBelle*, courts should avoid the cycle of releasing defendants who have somewhat stabilized but who will immediately return to the same pattern that caused them to need medical care. 107 Wn.2d at 206-7. This was the case here.

Dr. Beatty testified that, while his condition had somewhat stabilized, ultimately he recommended that P.E. should remain in inpatient until they could figure out "what additional supports are necessary to make sure that he stays sufficiently fed in the community," particularly given his near fatal condition upon admission. This testimony provides substantial evidence to support the court's finding that, although P.E. had "stabilized somewhat in the hospital setting," he would not be able "to provide for his essential needs of health and safety outside of the hospital." This finding, in turn, supported the conclusion that P.E. remained "too symptomatic to comply with a less restrictive treatment order."

Finally, P.E. argues that, although P.E. had refused to return to DESC when he was first detained, the court erred in considering this statement since "P.E. made this statement a full week before the commitment hearing." It is true that the State must present "*recent*, tangible evidence of failure or inability" to provide for essential human needs. *LaBelle*, 107 Wn.2d at 204-05 (emphasis added). But we hold that a statement P.E. made a week before the hearing in question is sufficiently recent to support the court's decision. And P.E. provides no authority stating otherwise. "'Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after

6

diligent search, has found none.'" *City of Seattle v. Levesque*, 12 Wn. App. 2d 687, 697, 460 P.3d 205 (2020) (quoting *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962)), *review denied*, 195 Wn.2d 1031, 468 P.3d 621 (2020)).

Furthermore, the record contained more recent evidence that P.E. had continued to experience delusions. Nursing progress notes described him as "loud and delusional" and that he told them he wanted to "get deported to Norway." During the hearing on the 14-day petition, P.E. tried to tell the court about his medical team in the U.K., one of the delusions his doctor had described.

In summary, we reject P.E.'s argument that his "partial stabilization, combined with [his] available housing and related case management services, indicates that . . . a less restrictive order was appropriate." The court did not abuse its discretion in finding that such facts did not show a less restrictive alternative was in his best interest.

## III.    CONCLUSION

We affirm the trial court's order.

Díaz, J.
_____

WE CONCUR:

Chung, J.
_____

_____

7